Smith, P. J.
The crime of which the defendant was convicted was the killing of one Amello Daugiolillo, by shooting him with a pistol. It occurred on Sunday the 5th of September, 1886, on Liberty alley, in the city of Rochester.
The defendant and an acquaintance of his named Angelo Peuta, had spent the afternoon together, part of the time walking in the streets and part of the time at a saloon, where each of them drank two glasses of beer. Late in the afternoon, or early in the evening, they entered Liberty alley and met Joseph Daugiolillo, a brother of the deceased, standing in the alley near his house. Some unfriendly words passed between Peuta and Joseph, and they soon engaged in a fight, Joseph endeavoring to beat Peuta with a stick of wood and the latter using his fists. During the controversy, the deceased came with a pitcher of beer, for which he had gone before the defendant and Peuta arrived, and shortly afterwards the pistol was discharged; the bullet entered the brain of the deceased and he expired almost instantly. All the parties were Italians and laborers. The deceased and his brother had each drunk a glass of beer shortly before the affray.
That the pistol was fired by the defendant, is shown by the testimony of all the witnesses who speak upon the subject, including the defendant himself.
That the circumstances attending the act were such as to warrant the conclusion that it was done deliberately, and with premeditation and an intent to kill, was also shown by abundant testimony. Indeed, the testimony of the defendant clearly showed that in firing the pistol, he acted deliberately and with premediation, his version of the trans *721 .action being to the effect that the deceased attacked him. with a razor, threatening to kill him, and that he, after recreating several steps, discharged the pistol in self-defense. The defendant testified, however, that he did not intend to kill. “I shot at him,” he said on his direct-examination, “ to scare him, I did not intend to kill him when I shot.”
As the theory that the homicide was an act of self-defense, and therefore justifiable, is largely relied on by the appellant’s counsel, and depends almost wholly upon the testimony of the defendant, it will be useful to state his testimony more fully. On his direct-examination, he stated in substance, that while Peuta and Joseph were having words, Anello came with a pitcher in his hand, and asked Peuta what the trouble was about. Peuta said it was nothing, and Anello told Joseph to take the pitcher into the house, and he did so. Peuta then talked with Anello, and while doing, so Joseph came with a stick of wood, and hit Peuta on the shoulder with it. Peuta then turned around and commenced striking him with his fists. “Just as they were fighting,” to use the words of the witness, “Joseph’s brother tried to run after me; he had a razor or knife in his hand, he was striking at me with it; I said ‘ what is the reason you are striking at me, I am a stranger, I don’t know you;’ he struck at me, and I stepped two or three steps back; I was afraid; I was afraid he was going to kill me. He was swearing at me; he said, I will kill you; you came here on purpose to kill my brother. * * * I kept going backward and he following me; then I pulled out my revolver; I hallooed at him two or three times to stand back; he was still following me when I was walking backwards; I shot at him to scare him; I did not intend to kill him when I shot; as soon as I shot I saw so many people gathered around there I ran away to No. 10 Canal street, I slept there over night.” He also testified that the next morning he- went to the place where he had been worHng, “ remained there three or four minutes, then went to Hreigsville on foot, to get some money; went three or four days walking towards Buffalo,” and then took a train to New York city, where he was arrested.
On his cross-examination he testified that the deceased struck at him three times with the razor; “the last time,” said the defendant, “was when I shot;” * * * “he was close enough to me to hit me with the razor when he raised it the third time;” * * * “I took the revolver from my pocket, my hind pocket on the right side; it did not draw easy from the pocket; I had a handkerchief in my pocket; I pulled out the handkerchief and the revolver came out with it; the revolver did not fall: I put the hand *722 kerchief in my pocket before I raised the revolver; I cocked the revolver when he thro wed the last hit at me; I had the-revolver in my hand then; I had it in my coat pocket- and cocked it in my pocket; that was after I pulled ifc from my hind pocket; I put it in my coat pocket; I cocked it when I pointed it at him-; had raised it when I cocked it, holding it at full length; I hallooed two or three times, holding it still at full length; he was still coming at me with the razor, cutting at me;, he was near enough to hit me with the razor, facing full towards me, and then I fired;, then I ran.”
The testimony of the defendant, so far as it tended to-establish the theory of self defense, stood alone, and was-controverted in several important particulars. No other witness saw Anello have a razor or other weapon, and. none was found upon his body or near it, although search, was made for it soon after the homicide. Joseph testified that Peuta had a razor in his hand when they were struggling, but Peuta denied it.
Joseph also testified that when he and Peuta were trying to hit each other, “Minisci” (the defendant) “wanted to-come in and help his partner, and my brother took him away and said, ‘let them fight it out;”’ * * * “Minisci walked up within two or three feet of me, and my brother told him to stand back; I next heard a shot;”
* * * u before the shot went off Minisci and my brother were about three feet apart * * * did not hear words between Minisci and my brother; my brother did not have a knife; * * * he was standing about a foot and. a half from the brick wall, and looking towards Peuta and me.” On his cross-examination he testified that at the time he heard the report of the revolver he could not see either Minisci or his brother; that he did not hear Minisci say anything to his brother that evening, or make any threats; and that he did not see a razor in his brother’s, hand.
Peuta testified that when he and Joseph were fighting,, he heard Minisci say in English, “look out, look out,” and immediately he heard a shot fired. He also testified, “the man shot was right up to the brick wall; he was leaning against it; Minisci was about eight steps from the wall, in the center of the alley.”
Rosa Baniello, who lived near by and with whom Peuta boarded, testified that when Peuta and Joseph were fighting she tried to separate them, and Anello said, “let them alone;” he was then in the alley, a couple of steps from her; she didn’t see him do anything when he said it; he stood still; she heard somebody say, “stand back, stand back;” didn’t know who said it; just at that moment heard a re *723 volver; heard the words and the pistol shot together; the man who was killed was by the brick wall, right by the wall; didn’t see whether he was leaning on it; didn’t see anybody have a knife during the fight; didn’t hear any words between Minisci and deceased; the man who was shot was looking towards Peuta when they were fighting.
Giacomo D’Orisollo testified that he came into the alley when the two men were fighting; saw Minisci with a revolver in his hand; he said, “back, back, back,” in Italian; about three minutes after that heard the report of the revolver; it was pointed towards deceased; the man who was shot did nothing; he was standing by the wall, with his hands behind his back. On his cross-examination he said, “Minisci only said, ‘stand back, stand back;’” the dead man was three or four steps from Minisci at the time. In reply to the question, “Was the man who was shot facing Minisci?” he said, “He was standing sidewise.”
Frank Adducio, a step-son of the witness Eosa Baniello, testified that he heard Minisci speak, “loud and quick,” in Italian, “look out, look out;” witness then looked at him; saw a revolver in his hand; heard the shot; Anello was about three feet from the men who were fighting; the last witness saw of him, he said, “let them fight, I won’t say nothing to them;” he just hung along the wall; that was all witness saw him doing; he didn’t see him fall; after the shot, Minisci and Peuta ran out of the alley; It was about seven o’clock; the sun was shining yet. ■
It does not appear that there were any other eye witnesses of the affair.
The testimony above referred to, if believed by the jury, exploded the idea that Anello made an attack on Minisci, and that the latter fired in self-defense.
Furthermore, the statement of Minisci that at the time of the shot, Anello was facing him, is effectually controverted by a silent but most convincing witness, namely, the course of the bullet. According to the testimony of the surgeons, who made the pas# mortem examination, the ball entered the head on the left side, a little aboyé and in front of the ear, and passed to the front of the head, striking the inner surface of the frontal bone, just about the median line and glanced back to about the middle of the right half of the brain, where it was found. That fact alone authorized the jury to find that when the shot was fired, Anello’s face was turned away from Minisci, and his left side was obliquely towards him. And that is in accord with several of the witnesses, who testified that Anello was standing on the east side of the alley looking at the combatants, who were in the middle of the alley, somewhat above or north of Anello, and that Minisci stood *724 below him when he fired. In short, had the jury found that the shooting was done deliberately and with premeditation as well as with a homicidal intent, the testimony would have supported the finding. That the.verdict does not reach so far, is a fault, if it be one, of which the defendant cannot complain.
It is contended by the appellant’s counsel, that if the act was not done in self-defense, no motive is shown for it. Proof of motive is of more or less importance in cases of purely circumstantial evidence, but where, as here, the defendant is indisputably the perpetrator of the alleged crime, there is no occasion for explaining the reason of his act. It is enough that the evidence does not absolutely exclude the existence of motive. As, for instance, by showing the accused to be insane.
As was said by Chief Justice Church, in People v. Bennett (49 N. Y., 148): “Motive is resorted to as a means of arriving at an ultimate fact, not for the purpose of explaining the reason of a criminal act which has been clearly proved, but from the important aid it may render in completing the proof of the commission of the act when it might otherwise remain in doubt. With motives, in any speculative sense, neither the law nor the tribunal which administers it has any concern.” Burr, on Cir. Evi., 296.
It was for the jury to say, in view of all the circumstances, whether the defendant, not acting in self-defense, intended to kill. The fact of his carrying a loaded revolver upon his person, was evidence of his intent to use it, when, and as, he should decide to do so; and, as the evidence tended to show, that he deliberately aimed at a vital part, when within a few feet of his unoffending victim, the jury were authorized to find a murderous intent.
There is no force in the position of the defendant’s counsel that the people did not show the grade of the offense, and that the jury were left to speculate in regard to it. The people appear to have given all the evidence in their power respecting the transaction, and it was left to the jury to determine upon the proof, under instructions from the court, whether a criminal homicide had been committed, and if so, what was its grade. In this, there was nothing to complain of, provided the instructions relating to the nature and grade of the offense, were unexceptionable, a matter which will be considered farther on.
The appellant’s counsel contends that the court erred in receiving evidence of certain admissions of the defendant. The witnesses who testified to the admissions were Kavanagh, a police officer, who brought the defendant from New York, and Lynch and Dugan, who were in jail with the defendant. The objection urged to the testimony of Kav *725 anagh, is founded upon his statement, that he did not understand the whole of the defendant’s conversation and did not understand the Italian language.
He testified, however, that Minisci “could talk English a little,” and that something was said in reference to the shooting, and on being asked to tell all that was said, he testified that, in reply to a question whether he did the shooting, Minisci replied, “Tes, I shoot; ” and in reply to other questions, he told when he left Rochester, and where he went. The statement was substantially the same as that which Minisci afterwards gave as a witness. In this, we see no error. It is fairly to be inferred from the testimony of Kavanagh that the replies of Minisci, narrated by the witness, were made in English, which, although broken, was understood by the witness. If it be urged that such replies may have been qualified or modified by that part of Minisci’s conversation which the witness admitted he did. not understand, it is a sufficient answer that the defendant was not harmed, inasmuch as he afterwards testified, without qualification, to the facts which the admissions tended to establish.
To the testimony of Lynch and Dugan, no objection was taken at the trial. Neither of them stated that any part of Minisci’s conversation with them was in Italian, or not understood by them. On cross-examination, Lynch said that Minisci talked in English, and Dugan said “he talked very broken English, and told me substantially as I have related it here, as near as I can get at it.” The admission testified to by Lynch was that Minisci “ and the Italian had a quarrel that day, and he pulled a knife on him two or three times and tried to stab him, and this night this Italian tried to stab him again, and he pulled out a revolver and shot him.” The admission, as testified to by Dugan, was that the man who had been fighting with Peuta, “ ran at him with a knife; he said he told him to stand back, and he repeated the act, and he drew a revolver and shot at him.” The testimony of Lynch furnishes no ground for saying that he did not fully understand what Minisci said to him.
If the statement made by Dugan, on cross-examination, raises any doubt as to whether he undestood correctly what Minisci said, the admission of his testimony did not prejudice the defendant, it being substantially identical with the defendant’s own testimony, with the unimportant exception that it described the slain man as the man who had been fighting with Peuta. We assent to the rule laid down in the California Case, cited by the appellant’s counsel, that a witness with a very imperfect knowledge of the language is not competent to testify to a conversation in *726 which a confesssion was made, if he did not understand the whole of it (39 Cal., 663); but for the reasons above-stated, we think it does not control the present case.
The defendant’s counsel put to the witness, King, the following question: “What did Peuta say with reference to Daugiolillo having a knife or razor on the night in question ?” An objection to the question was sustained. Properly so, for the reason that for the purpose of showing that Peuta had made a statement contradictory of his testimony, it was only competent to ask if he made the statement which he denied having made when he was examined with a view of laying a foundation for the contradiction. That question was asked immediately after the ruling referred to, and it was answered.
The questions put to the witness, Cary, as to the calibre of the bullet and cartridges shown him were unobjectionable. It is to be assumed that they were the bullet taken from the brain of the deceased and the cartridges found in the defendant’s trunk, and which had been put in evidence. The objection was not upon the ground that they were not the same. The testimony sought, tended to identify the defendant as the person who fired the pistol; but as he subsequently admitted the fact on the stand, the testimony was not important, and its reception, even if erroneous, worked no harm.
The witness, Thein, testified that soon after the shooting he saw blood on the grating and in the cellar underneath it. That testimony, the defendant’s counsel moved to strike out, when the people rested. The motion was properly denied. The testimony tended to identify the spot where the deceased was when he was shot.
Several other exceptions were taken to rulings upon the reception or rejection of evidence, but they are so clearly devoid of merit as to require no comment.
Some objections are made to the charge. The surgeons testified that in the post mortem examination they found a bruise on the back of the head. One of them testified that it was such a wound as would naturally be caused by a person being shot and falling backwards. He also testified that the bullet was sufficient to produce death; “the other wounds might have contributed to hasten death; do not know they may have produced death.” Upon that testimony it appears to have been claimed at the trial that deceased was not killed by the shot. The judge said in his charge that he did not care to discuss that question seriously, for it would seem that the death must have been caused by the bullet-wound, but he left the question to the jury. And he instructed them, in substance, that whether the death was caused by the bullet-wound or the wound on *727 the back of the head; in either event the people’s case was made out, for the shooting was the cause of the fall which produced the bruise. It is now contended that this direction left the jury at liberty to find that the death resulted from a case not alleged in the indictment, and, therefore, was error. The indictment alleged the killing by a pistol shot. It is true that there could be no conviction unless the proof showed the fact of the death of the person alleged to have been killed, and the fact of killing by the defendant as alleged. Penal Code, § 181, as amended 1882.
But the charge was correct. It was immaterial whether death resulted from the injury to the brain directly caused by the bullet, or whether it was produced or hastened by the injury resulting from the fall, which, of, itself, was the direct and immediate result of the shooting. In the latter case the variance, if it may be so termed, could not possibly have misled or embarrassed the defendant at the trial. It ■should, therefore, be disregarded. Real v. The People, 42 N Y., 270, 279.
The appellant’s counsel has wrested from its context a single expression of the learned judge respecting the law of self defense, and now makes it the subject of an objection, although it was not excepted to at the trial.
The judge, speaking of a person attacked and having reason to believe that his assailant intends to kill him or do him serious bodily harm, said: “His duty is to get out of the way without taking life.” He had said in the next preceding sentence, that a person so situated has the right to defend himself, “and it may be that his right to defend himself extends to the taking of the life of the man attacking him.” And the expression now objected to, was followed immediately by these words: “ But if he has retreated as far as he can, and cannot avoid the attack, he has a right to defend himself, and if he, in his defense, kills the attacking party, the law will acquit him.” In view of the entire charge on the subject, the objection is without force. The duty asserted, of one attacked with a dangerous weapon, to get out of the way, is qualified in the charge by the condition that retreat is open to him, and the attack can thereby be avoided, and in those circumstances, the ■duty cannot be questioned.
In further commenting upon the defense, the judge said: “Upon this, the evidence is substantially that of the defendant himself. It is worthy of consideration that you did not receive this statement at first hand from the mouth of the witness, but that it had to go through the mind of the interpreter; but after all there seemed to be no complaint of that. Whether it was accurately interpreted, it will be for you to say, but it is not doubtful that this fact *728 rendered it to some extent less satisfactory than if we had got it at first hand.” No exception was taken to this, but. it is now urged that it left the jury to construe the testimony of the defendant as they saw fit, and that we should, hold that it was a misdirection which did the defendant, such injustice'as that a new trial should be granted. We-fail to see that the remark could have prejudiced the defendant. It was rather in his favor. It was doubtless, intended and understood as a suggestion that the fact that, the defendant was under the necessity of speaking through an interpreter, put him at a disadvantage, as a witness in his own behalf.
A few other objections are taken to portions of the-charge, all of which have been examined, but they point, to no error.
The judgment and order should be affirmed.
Barker, Haight and Bradley, JJ., concur.